# In the United States Court of Federal Claims

No. 22-725C
(Filed: June 5, 2023)

* * * * * * * * * * * * * * * * * * * * *

JONATHAN DINH *et al.*,

            *Plaintiffs*,

v.

THE UNITED STATES,

            *Defendant*.

* * * * * * * * * * * * * * * * * * * * *

    *Roger J. Marzulla,* Marzulla Law, LLC, Washington DC, with whom was *Nancie G. Marzulla*, for plaintiffs. *Gregory H. Bevel*, Rochelle McCullough, LLP, Dallas TX, and *Rafael Gonzalez*, Godreau & Gonzalez Law, LLC, San Juan PR, of counsel.

    *Nathanael B. Yale*, Senior Trial Counsel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *L. Misha Preheim*, Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton*, Principal Deputy Assistant Attorney General, for defendant.

<u>OPINION</u>

BRUGGINK, *Judge*.

    This is an action against the United States, seeking just compensation under the Fifth Amendment for the alleged taking of plaintiffs' private property. Plaintiffs in this case are owners of First Subordinated Secured Bonds issued by Corporación del Fondo de Interés Apremiante ("COFINA"),

an instrumentality of the Commonwealth of Puerto Rico.[1] Plaintiffs allege that their property interests as COFINA bondholders were taken without just compensation as a "direct and intended result" of Congress's enactment of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). *See* Second Am. Compl. ("Compl.")[2] ¶ 31. Pending is defendant's motion to dismiss for lack of jurisdiction, or, in the alternative, for failure to state a claim upon which relief can be granted. The motion has been fully briefed, and oral argument was held on April 13, 2023. For the reasons set out below, we grant defendant's motion to dismiss under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").

BACKGROUND

Enacted on June 30, 2016, PROMESA is a statute that authorizes an Oversight Board established under the Act to initiate bankruptcy proceedings—also referred to as Title III proceedings—for a territory or territorial instrumentality. PROMESA established an Oversight Board for Puerto Rico on the same date, created as "an entity within the territorial government"; PROMESA expressly states that an Oversight Board "shall not be considered to be a department, agency, establishment, or instrumentality of the Federal Government." 48 U.S.C. § 2121(c) (2018). As other COFINA-related cases make clear, the Oversight Board for Puerto Rico then took a series of discretionary actions, which resulted in the restructuring of COFINA's debts. Those actions included designating COFINA as an instrumentality covered by PROMESA, issuing a restructuring certification for COFINA, and then filing a Title III petition on behalf of COFINA in the United States District Court for the District of Puerto Rico. The Oversight Board also represented COFINA during the Title III case and submitted a plan of adjustment for COFINA's debts, which would allow junior COFINA bondholders (such as plaintiffs) to make a 56.41% recovery on the repayment of principal and interest on their bonds. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F. Supp. 3d 203, 233 (D.P.R. 2019), *aff'd*, 987 F.3d 173, 177 (1st Cir. 2021). The district court—also referred to as the "Title III

---

[1] As owners of First Subordinated Secured Bonds issued by COFINA, plaintiffs are in effect junior COFINA bondholders. Plaintiffs refer to First Subordinated Secured Bonds as "COFINA bonds" throughout their complaint.

[2] After filing the original complaint on June 29, 2022, *see* ECF No. 1, plaintiffs amended their complaint twice. Unless otherwise noted, the "complaint" from hereon will refer to the second amended complaint filed on November 1, 2022. *See* ECF No. 9.

court"—confirmed the plan of adjustment on February 5, 2019.

Plaintiffs' complaint, however, skips over the actions of the Oversight Board and makes only an oblique reference to the Title III court for having "rebuffed the COFINA Bondholders' challenge" to the curtailment of their property interests. *See* Compl. ¶ 30. Pushing both the Oversight Board and the Title III court into the barely acknowledged background, plaintiffs take aim instead at an act of Congress. The crux of plaintiffs' claim lies in the allegation that the United States is liable for just compensation because Congress's enactment of PROMESA caused the taking of their property. *See* Compl. ¶ 31 ("As a direct and intended result of Congress's enactment of [PROMESA], COFINA Bondholders lost a significant portion of the principal and interest each COFINA Bondholder was entitled to and the fair market value of the pledged revenues, their security interests and liens on COFINA funds, as well as other compensable property rights."); *id*. at ¶ 35 ("But for Congress's enactment of [PROMESA], Plaintiffs would have received the payments of principal and interest they were entitled to under the terms of their COFINA bonds and would have retained a security interest . . . that they could have executed in the event of default."). Plaintiffs characterize the alleged taking as a "legislative taking," which they define as "Congress's enactment of a statute that impairs or destroys the property rights of a targeted group of owners." Pls.' Resp. at 21.

As we will see, plaintiffs' claim cannot succeed on the merits without demonstrating sufficient federal action to warrant liability in the United States—hence plaintiffs' consistent assertion that Congress intended PROMESA to result in the taking of their property without just compensation. And yet, as plaintiffs conceded at oral argument, they suffered no actual injury on the day that Congress enacted PROMESA. To be able to point to injury, their claim requires moving further along the timeline of events. *See* Oral Arg. at 46:00 to 46:42 (plaintiffs conceding that their claim would not have been "ripe" in 2016 because "money hadn't actually been taken yet"). As we explain below, however, the fact that the actual injury occurred at a later date is fatal for plaintiffs because it means that the alleged taking was completed through the discretionary actions of a non-federal entity. Unsurprisingly, this dilemma has left plaintiffs reluctant to place precisely the date of taking in either their complaint or their brief; at most, they suggest that the alleged taking occurred somewhere during the date range of June 30, 2016, to February 5, 2019. *See* Pls.' Resp. at 17; *id*. at 18 ("But the issue of whether COFINA Bondholders owned their bonds on the date of taking—whether that be the date PROMESA was passed or the date it was implemented to deprive them of their property or some date in between—cannot be used to dismiss this case.").

3

In short, plaintiffs' claim attempts to navigate two opposing currents. It has to rely on sufficient federal action as the prime motive force, while simultaneously incorporating events and actors having nothing to do with the United States, an attempted course adjustment which has the potential for causing shipwreck. We are satisfied that no degree of navigational skill can salvage the effort.

## I.   The Creation of COFINA

In 2006, the Commonwealth of Puerto Rico was in the midst of a fiscal crisis: having consistently spent more than it received in taxes and other revenues, Puerto Rico faced decreased direct access to the credit markets because of the Puerto Rican Constitution's limits on sovereign debt.[3] *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 987 F.3d 173, 177 (1st Cir. 2021). The Legislative Assembly of Puerto Rico passed Act 91 on May 13, 2006, as a response to the crisis. *Id*. The Act created COFINA, "a public corporation and instrumentality of the Commonwealth of Puerto Rico" that was "independent and separate" from the Commonwealth. *See* P.R. Laws Ann. tit. 13 § 11(a). The stated purpose of COFINA was to "issue[] bonds and utilize[e] other financing mechanisms" to pay the Commonwealth's outstanding debts as well as future operating expenses. *See id*. § 11(b).

The bonds that COFINA issued were different in kind from the general obligation ("GO") bonds issued by Puerto Rico. *See In re Fin. Oversight*, 987 F.3d at 177; Am. Jur. 2d Ed. § 295 ("General obligation bonds issued by states and governmental units are, by definition, payable from and secured by a pledge of the issuer's taxing power. . . . The full faith and credit of the issuer is pledged for repayment of general obligation bonds, and the promise to pay is unconditional."). That is, COFINA bonds were payable from and secured by specific collateral, not by a pledge of the full faith, credit and taxing power of Puerto Rico. *See* P.R. Laws Ann. tit. 13 § 13(d) (providing that the "full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged" for the COFINA bonds).

Specifically, Act 91 required a portion of sales and use tax revenues ("SUT revenues") to be deposited directly in the Dedicated Sales Tax Fund

---

[3] Because the allegations in this case almost wholly involve acts of legislatures and courts, the factual background blurs into the controlling law. We therefore cite cases and statutes where the cited material supplements but is not inconsistent with plaintiffs' statement of facts in the complaint.

("DSTF") each year. The DSTF was the "property of COFINA," which was "[not] available to the Commonwealth of Puerto Rico." *Id.* at § 12. COFINA had to use the DSTF exclusively for the purposes specified in § 13, including the repayment of principal and interest on the COFINA bonds as they became due. *See id.* at § 13(a)(3). Moreover, Act 91 authorized COFINA to "pledge and otherwise encumber all or part of [the DSTF]" for the repayment of principal and interest on the bonds. *Id.* at §13(b). That pledge was "valid and binding as of the time it is made without the need for a public or notarized document." *Id.*

COFINA subsequently made such a pledge in the Sales Tax Revenue Bond Resolution ("Bond Resolution"), the borrowing contract among COFINA, the COFINA bondholders, and the Bank of New York Mellon as trustee. The Bond Resolution, as amended and restated on June 10, 2009, gave the bondholders a security interest in: "(1) the DSTF, (2) all COFINA Revenues, as defined in the Bond Resolution, (3) all right, title, and interest of COFINA in and to COFINA Revenues, and all rights to receive the same, and (4) funds, deposits, accounts, and subaccounts held by the Trustee." Compl. ¶ 15. COFINA bondholders thus had automatically perfected liens which they could execute in the event of a default in the payments of principal and interest. *See id.* at ¶ 12.

Between 2009 and 2011, COFINA issued a series of bonds that bore interest rates between 3.63% and 7.48% and matured between August 1, 2017, and August 1, 2050. *Id.* at ¶ 13. Although plaintiffs here do not specify when they purchased their bonds, they allege that they were "at all material times the owners of a substantial quantity of COFINA bonds," where the "material times" refers to the date range from June 30, 2016, to February 5, 2019. *See id.* ¶¶ 1-8; Pls.' Resp. at 17.

By May 2017, there was $9.81 billion in aggregate principal amount of COFINA bonds outstanding, consisting of $7.39 billion principal amount of current interest bonds and $1.50 billion principal amount of capital appreciation bonds. Compl. ¶ 13. Puerto Rico regularly transferred the statutorily required portion of SUT revenues to the DSTF, so that by May 2017, the DSTF held over $600 million as security for the repayment of COFINA bonds' principal and interest. *Id.* at ¶ 12; Pls' Resp. at 3.

## II.    The Passage of PROMESA

Despite these new measures, Puerto Rico's financial crisis worsened so that by 2013, Puerto Rico's three public utility companies (power, water, and highways) were more than $20 billion in debt. Compl. ¶ 16; *see also*

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 118 (2016). Puerto Rican instrumentalities, however, could not access the federal municipal bankruptcy process under Chapter 9 of the Bankruptcy Code. *See Franklin Cal.* at 130. Their exclusion from federal bankruptcy protections dated back to 1984, when Congress amended the Bankruptcy Code's definition of a "State" to exclude Puerto Rico "for the purpose of defining who may be a debtor under chapter 9 of this title." *See* 11 U.S.C. § 101(52) (2018). The amendment precluded Puerto Rico—as well as any other United States territory—from authorizing its municipalities to file a Chapter 9 petition, which effectively barred access to federal bankruptcy proceedings for Puerto Rican instrumentalities. *See* 11 U.S.C. § 109(c)(2) (requiring "States" to authorize their municipalities to seek relief before a municipality may file a Chapter 9 petition); *id.* at § 101(40) (defining a "municipality" as a "political subdivision or public agency or instrumentality of a State").

As a result, Puerto Rico passed the Puerto Rico Corporation Debt Enforcement and Recovery Act ("Recovery Act") in 2014, providing a non-federal path for its instrumentalities to restructure their debts. The Recovery Act could not be enforced, however, because it was pre-empted by federal law. *Franklin Cal.*, 549 U.S. at 125 ("[The Bankruptcy Code] precludes Puerto Rico from authorizing its municipalities to seek relief under Chapter 9, but it does not remove Puerto Rico from the reach of Chapter 9's pre-emption provision.").

Ultimately, on June 30, 2016, Congress enacted PROMESA pursuant to its plenary power over the territories, *see* 48 U.S.C. § 2121(b)(2), making it possible for territories and their instrumentalities to adjust their debts in bankruptcy proceedings.[4] PROMESA, however, is not simply an extension of the Bankruptcy Code to the territories. The implementation of PROMESA first of all requires the establishment of an Oversight Board, the purpose of which is to "provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." *See* § 2121(a). Title I thus sets out the organization of an Oversight Board, while Title II and Title III outline its responsibilities—which include the approval of fiscal plans and budgets for a territory or territorial instrumentality, as well as duties related

---

[4] PROMESA specifically established an Oversight Board for Puerto Rico on the date of its enactment. *See* § 2121(b)(1). Nevertheless, the language of PROMESA is general and also applies to territories other than Puerto Rico once an Oversight Board is established for such a territory. *See* § 2121(c)(1) ("An Oversight Board established under this section shall be created as an entity within the territorial government for which it is established in accordance with this title . . . .").

to the adjustment of debts. *See* §§ 2141, 2142, 2146.

As the portion of PROMESA that deals specifically with the adjustment of debts, Title III incorporates many sections of the Bankruptcy Code. *See* § 2161(a). But differences exist. For instance, the Bankruptcy Code requires a municipality to be insolvent to qualify as a debtor. *See* 11 U.S.C. § 109(c)(3). Title III, however, does not require a debtor to be insolvent. *See* 48 U.S.C. § 2162. Where the entity in question is a territorial instrumentality rather than a territory, all that Title III requires is that it: (1) be "covered" under PROMESA; (2) have a restructuring certification issued by an Oversight Board; and (3) desire to effect a plan to adjust its debts. *See id*. Indeed, the first two requirements are unique to Title III since they cannot be met unless the Oversight Board chooses to act, a determination it makes "in its sole discretion." *See* §§ 2121(d)(1)(A), 2146(a). Title III, moreover, does not authorize a debtor to directly file a petition for bankruptcy, unlike the Bankruptcy Code—the Oversight Board must file a petition on behalf of a debtor. *See* 48 U.S.C. § 2164(a); 11 U.S.C. §§ 301, 901. The filing of the petition by the Oversight Board commences a voluntary case under Title III, after which the Oversight Board continues to serve as the "representative of the debtor" and submits or modifies any plans of adjustment for the debtor. *See* 48 U.S.C. § 2175.

Title III also has its own provisions with respect to jurisdiction and venue. First, Title III provides district courts with "original and exclusive jurisdiction of all cases under [Title III]," and "original but not exclusive jurisdiction of all civil proceedings arising under [Title III], or arising in or related to cases under [Title III]." § 2166(a). Where a covered territorial instrumentality is the debtor, venue is proper in the district court for the territory in which the instrumentality is located. § 2167(a)(2). However, only the designated district court judge may conduct a Title III case, *see* § 2168, so that the district court hearing a Title III case is also referred to as the "Title III court" in judicial opinions.

To confirm a plan of adjustment submitted by an Oversight Board, the Title III court must determine if the plan meets the requirements of § 2174(b). Among other requirements, the plan must comply with applicable provisions of the Bankruptcy Code and with Title III of PROMESA, and the debtor must not be "prohibited by law from taking any action necessary to carry out the plan." *See* § 2174(b). An appeal of the Title III court's decision is taken "in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district court." § 2166(e).

### III.  The Adjustment of COFINA's Debts Under Title III

On September 30, 2016, the Oversight Board for Puerto Rico designated COFINA as a "covered entity" subject to the requirements of PROMESA and eligible to qualify as a debtor under Title III. *In re Fin. Oversight*, 361 F. Supp. 3d at 219. For the Oversight Board to even begin formulating a Title III plan, however, there was an important threshold question that had to be resolved: whether COFINA or the Commonwealth had superior rights to the SUT revenues transferred to the DSTF. *Id.* at 220. The answer would determine which entity had possession of funds allegedly exceeding $600 million by May 2017 to pay its debts.

A dispute over the DSTF was set off in the lawsuit that GO bondholders filed on July 20, 2016, shortly after the Commonwealth defaulted on payments to GO bondholders pursuant to Executive Order 30. *See Lex Claims, LLC v. Garcia-Padilla*, 236 F. Supp. 3d 504, 512 (D.P.R. 2017), *rev'd in part*, 853 F.3d 549 (1st Cir. 2017) (holding that PROMESA's stay applies to litigation seeking declaratory and injunctive relief). In their complaint—amended in November 2016 to include new causes of action relating to COFINA—GO bondholders asked the court to declare the default unlawful and grant injunctive relief, including an order that COFINA transfer the SUT revenues it held to the Commonwealth. *Id*. Specifically, they alleged that the Commonwealth's obligation to pay GO bondholders was a "constitutional debt," and that the Puerto Rican constitution required using SUT revenues first to satisfy GO bond obligations, not COFINA bond obligations. *Id*. at 509-510. Because the First Circuit held that PROMESA's automatic stay provision applied, however, the constitutional issue that the GO bondholders raised was not resolved by the First Circuit's decision in April 2017.[5] *See Lex Claims, LLC v. Fin. Oversight & Mgmt. Bd.*, 853 F.3d 549, 551 (1st Cir. 2017).

Against this backdrop, the Oversight Board determined that the best way to resolve the dispute over the allocation of the DSTF was for it to file

---

[5] On April 29, 2017, the fate of the DSTF became more uncertain with the Puerto Rico Legislative Assembly's enactment of Act No. 246, which allowed COFINA's SUT revenues to be used to pay Puerto Rico's general debts under certain circumstances. *See* Compl. ¶ 29; Fiscal Plan Compliance Act, Act 26-2017 (Apr. 29, 2017) ("[T]he Executive Branch is hereby empowered to use COFINA funds occasionally, only as the last resort, and subject to the filing of a sworn certification with the Legislative Assembly."). Although unclear on the details, plaintiffs allege that on May 3, 2017, "[w]ithin days" of the enactment of Act No. 246, COFINA defaulted on its obligations to COFINA bondholders. *See* Compl. ¶ 29.

a Title III petition for both the Commonwealth and COFINA and afford the parties "additional time and breathing room to seek to resolve the impasse under the supervision of the Title III court." *In re Fin. Oversight*, 361 F. Supp. 3d at 223. Thus, on May 3, 2017, the Oversight Board issued a restructuring certificate and filed a Title III petition on behalf of the Commonwealth. *Id*. at 220. Likewise, on May 5, 2017, the Oversight Board issued a restructuring certification and filed a Title III petition on behalf of COFINA. *Id*. The two Title III cases were then combined for procedural purposes only.

Upon the commencement of these cases, the Title III court requested that the Oversight Board work with interested creditor parties to formulate a procedure for resolving the Commonwealth-COFINA dispute. *Id*. at 224. The Title III court approved such a procedure on August 10, 2017, which provided for the appointment of agents independent from the Oversight Board to litigate, mediate, and/or settle the dispute. *Id*. Then, on June 7, 2018, agents appointed to represent the Commonwealth and COFINA announced the terms of an "Agreement in Principle" at the end of arm's-length negotiations. *Id*. at 225. The central component of the Agreement divided the disputed SUT revenues by allocating 53.65% to COFINA and 46.35% to the Commonwealth.[6] *Id*.

In July 2018, the Oversight Board began working on a plan of adjustment for COFINA's debts using the framework of the Agreement. *Id*. at 225-26. The Oversight Board first certified the "Title III Plan of Adjustment of Puerto Rico Sales Tax Corporation" on October 19, 2018, which it then amended three times. *Id*. at 228-29. After the Oversight Board certified the Third Amended Plan ("the Plan"), the Title III court heard arguments on all objections to the Plan and confirmed it on February 5, 2019. Its upshot was that senior COFINA bondholders would make a 93.01% recovery on their bonds while junior COFINA bondholders would make a 56.41% recovery, or about fifty-five cents on the dollar in new COFINA bonds relative to the par value of their original bonds. *Id*. at 233; *see also In re Fin. Oversight*, 987 F.3d at 179.

---

[6] Plaintiffs allege in their complaint that they were "not parties [to the agreement that resolved the Commonwealth-COFINA dispute]" and that they were "unaware of this agreement until it was submitted to the federal district court for approval." Compl. ¶ 30. Nevertheless, they acknowledge that "some COFINA Bondholders challenged this secret agreement that drastically curtailed their bond rights and security for repayment," and that the Title III court "rebuffed the COFINA Bondholders' challenge to this agreement." *See id*.

The Title III court made the following conclusions of law as it confirmed the Plan. First, the Plan fully complied with applicable provisions of the Bankruptcy Code, including the provision about creditors voting to accept or reject the plan. The court found that "[a]ll classes of creditors entitled to vote to accept or reject the Plan have voted to accept the Plan in accordance with the requirements set forth . . . ." *Id*. at 240. Second, the Plan fully complied with Title III of PROMESA. *Id*. at 240. Third, COFINA, the debtor, was not prohibited by law from taking any action necessary to carry out the plan. *Id*.

Addressing junior COFINA bondholders' argument that the Plan and Settlement Agreement effected a taking without just compensation in violation of the Fifth Amendment, the Title III court applied the three-factor test for regulatory takings under *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978) and rejected the challenge.[7] *Id*. at 244. First, the court held that the Plan would not result in the total destruction of the value of bondholders' property. *Id*. at 244. Second, the court held that the Plan would interfere only with "bondholders' subjective investment expectations," rather than "reasonable expectations"—which must take account of the claims in the Commonwealth-COFINA dispute that the Plan proposed to resolve. *Id*. Third, the court held that Plan was a "quintessential example" of a "public program adjusting the benefits and burdens of economic life to promote the common good." *Id*. Moreover, even in the event that the Plan resulted in a taking, the court was "satisfied that the value to be received by bondholders as a result of the settlement of the Commonwealth-COFINA dispute and under the Plan constitutes just compensation." *Id*. As the court noted, the alternative to the Plan was "protracted litigation in the Adversary Proceeding, which could lead to an all-or-nothing recovery for either the Commonwealth or COFINA." *Id*. at 246.

---

[7] The test for regulatory takings under *Penn Central* is "an essentially ad hoc, factual" inquiry that looks to the following three factors as having particular significance: (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124. The Court held in *Penn Central* that a taking is more readily found "when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id*. (internal citation omitted).

Once confirmed, the Plan was implemented on February 12, 2019, and an appeal followed. *In re Fin. Oversight*, 987 F.3d at 180. The First Circuit affirmed the confirmation of the plan, dismissing the appeal as equitably moot. *Id*. at 177 ("No party sought to stay the Title III court's order approving the Plan, which has been fully implemented for nearly two years and given rise to transactions involving billions of dollars and likely tens of thousands of individuals.").

Plaintiffs filed the present suit as a class action[8] on June 29, 2022, naming Jonathan Dinh and Dwight Jereczek as Representative Plaintiffs whose claims are "typical of the claims of all other members of the COFINA Bondholders class as described in this Complaint." ECF No. 1. They amended the complaint twice, first on October 31, 2022, and again on November 1, 2022, adding eight named Representative Plaintiffs to the original complaint. *See* ECF No. 8, 9. The descriptions of all Representative Plaintiffs are identical; they assert the same takings claim "on behalf of all persons and entities that owned [First Subordinated Secured] COFINA bonds between June 30, 2016, and February 5, 2019, excluding persons or entities that voted for or consented to the alteration of their COFINA bond rights." *See* Compl. ¶ 8. Plaintiffs allege that "[a]s a direct and intended result of Congress's enactment of [PROMESA], COFINA Bondholders lost a significant portion of the principal and interest each COFINA Bondholder was entitled to and the fair market value of the pledged revenues, their security interests and liens on COFINA funds, as well as other compensable property rights." *Id*. at ¶ 31.

Defendant filed its motion to dismiss on December 7, 2022. It makes four arguments regarding this court's asserted lack of subject matter jurisdiction and five arguments asserting plaintiffs' failure to state a claim upon which relief may be granted.

<u>DISCUSSION</u>

## I.      **This Court Has Subject Matter Jurisdiction over Plaintiffs' Takings Claim Under the Tucker Act.**

Because subject matter jurisdiction is a "threshold requirement for a court's power to exercise jurisdiction over a case," *Dow Jones & Co., Inc. v. Ablaise Ltd*., 606 F.3d 1338, 1348 (Fed. Cir. 2010), we first determine

---

[8] Plaintiffs' motion to certify the class under RCFC 23(c) was filed on May 1, 2023. Consideration of the motion was stayed until resolution of the pending motion to dismiss.

whether we have subject matter jurisdiction to hear plaintiffs' takings claim. In doing so, we "accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).

The subject matter jurisdiction of this court is defined by the Tucker Act, which grants jurisdiction to this court to "render judgment upon any claim against the United States founded either upon the Constitution, or any act of Congress or any regulation of an executive department." 28 U.S.C. §1491(a)(1) (2018). Although the Tucker Act constitutes an unequivocal waiver of sovereign immunity, it does not create a substantive right for monetary relief against the United States. *See United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003). Thus, to support this court's subject matter jurisdiction, there must be a separate source of law that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)). Where a money-mandating source exists, this court has exclusive jurisdiction to award compensation in excess of $10,000, because concurrent jurisdiction of district courts under the Little Tucker Act is limited to claims "not exceeding $10,000 in amount." *See* 28 U.S.C. § 1346(a)(2).

Here, a money-mandating source undoubtedly exists: the text of the Fifth Amendment mandates just compensation when the government takes private property for public use. U.S. Const. amend. V ("[N]or shall property be taken for public use, without just compensation."). Notwithstanding the presumption of Tucker Act jurisdiction under the Takings Clause, however, defendant asserts that this court lacks subject matter jurisdiction over plaintiffs' takings claim for four reasons. We reject all four.

**A. Plaintiffs Allege a Taking Effected by an Act of Congress, Which This Court Has Jurisdiction to Hear Under the Tucker Act.**

Defendant's first argument is based on what it takes to be the "true nature" of plaintiffs' takings claim as opposed to what plaintiffs have pleaded in their complaint. That is, defendant argues that this court lacks jurisdiction because "properly framed, the acts that purportedly took plaintiffs' property interests include a series of discretionary decisions by the Oversight Board, which the Supreme Court unanimously held does not constitute the United States for statutory and constitutional purposes." Def.'s Reply at 2.

The basic premise behind defendant's argument is correct: this court lacks jurisdiction over claims against a party other than the United States. *United States v. Sherwood*, 312 U.S. 584, 588 (1941). Thus, to establish jurisdiction, a plaintiff claiming a taking in this court must allege that their property was taken by federal action. *See Altair Global Credit Opportunities Fund (A), LLC v. United States*, 151 Fed. Cl. 276, 285 (2020) (*Altair II*). To be sure, defendant does not deny that plaintiffs have made such allegations: here, plaintiffs clearly allege a taking by federal legislation. Nor does defendant argue that plaintiffs' allegations are frivolous. Instead, defendant objects to the "true nature" of plaintiffs' claim, arguing that the alleged taking is "necessarily predicated" on the actions of a non-federal entity. *See* Def.'s Mot. to Dismiss at 11. Such an argument, however, goes to the merits of plaintiffs' claim rather than our jurisdiction, because it concerns whether plaintiffs can actually establish sufficient federal action to create a takings liability for the United States.

Although difficult to maintain at times, the distinction between a jurisdictional question and a question on the merits of a claim is not a meaningless one. The Federal Circuit has repeatedly held that once the plaintiff identifies a money-mandating source to establish Tucker Act jurisdiction, whether the plaintiff is entitled to relief under that source is a question on the merits of the claim. *See Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007); *Doe v. United States*, 463 F.3d 1314, 1325 (Fed. Cir. 2006). There is, in short, "no further jurisdictional requirement that the court determine whether the additional allegations of the complaint state a nonfrivolous claim on the merits." *See Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008). Thus, whether a particular government action is sufficient to create a takings liability is a question that we address when we evaluate a motion to dismiss for failure to state a claim. *See Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998).

Because plaintiffs' complaint unambiguously alleges that federal action took their property without just compensation, we have subject matter jurisdiction under the Tucker Act. *See Altair II*, 151 Fed. Cl. at 288 (assuming jurisdiction over claims alleging that Congress's enactment of PROMESA effected a taking).

## B. PROMESA Does Not Displace This Court's Tucker Act Jurisdiction over Plaintiffs' Takings Claim.

Defendant also argues that this court lacks subject matter jurisdiction because PROMESA mandates that this action be brought in the district court

for the District of Puerto Rico:

> Except as provided in . . . title III (relating to adjustments of debts), any action against the Oversight Board, and any action otherwise arising out of this Act, in whole or in part, shall be brought in a United States district court for the covered territory. . . . 48 U.S.C. § 2126(a).

Defendant asserts as a threshold matter that this action "'arises out of' PROMESA, if not 'in whole' then certainly at least 'in part,' because [plaintiffs'] takings claim is explicitly based on Congress's enactment of PROMESA." Def.'s Mot. to Dismiss at 14. Defendant then argues that the broad and mandatory language of § 2126(a)—as seen in the use of "any" and "shall"—is sufficient indication of Congress's intent to displace Tucker Act jurisdiction over plaintiffs' takings claim. It maintains that "[i]f a statute is clear enough in making another forum exclusive, it does not need to 'mention' the Tucker Act by name, refer to the Fifth Amendment or constitutional claims, nor does it need to use any other magic words to exclude this Court from its application." Def.'s Reply at 5.

Assuming for now that plaintiffs' takings claim arises out of PROMESA, in whole or in part, we do not find in PROMESA the kind of clear congressional intent required to displace this court's jurisdiction under the Tucker Act. Although Congress has the power to withdraw Tucker Act jurisdiction, including jurisdiction over takings claims, *see Horne v. Dep't of Agric.*, 569 U.S. 513, 527 (2013), a withdrawal of Tucker Act jurisdiction by implication is disfavored. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1017 (1984). Thus, Tucker Act jurisdiction is not displaced unless another remedial scheme reflects Congress's "unambiguous intention to withdraw the Tucker Act remedy" otherwise available to the plaintiff. *See Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007). In undertaking this analysis, courts must examine "the purpose of the [statute alleged to displace the Tucker Act], the entirety of its text, and the structure of review that it establishes." *Horne*, 569 U.S. at 527.

Examining the entirety of PROMESA shows, first of all, that requiring plaintiffs to bring their takings claim in district court amounts to limiting the remedies they may seek. Because PROMESA does not itself waive sovereign immunity,[9] a plaintiff suing the United States for monetary

---

[9] There is no provision of PROMESA that may be read as an unequivocal waiver of sovereign immunity. Remedies contemplated under § 2126 do not include relief sought against the United States:

relief must look to either the Tucker Act or the Little Tucker Act for a waiver of sovereign immunity. The Little Tucker Act, however, allows the district court to award only up to $10,000 of monetary relief—which is less than the amount plaintiffs seek in this action. Thus, were plaintiffs to sue in district court, the district court would lack jurisdiction to grant the monetary relief that they seek. Defendant did not assert otherwise at oral argument, merely pointing to forms of equitable relief which the district court could have granted had the plaintiffs brought their takings claim there earlier, such as declaring the enactment of PROMESA unconstitutional under the Declaratory Judgment Act or refusing to confirm the Plan. *See* Oral Arg. at 7:00 to 9:50.

Equitable relief, however, cannot replace monetary relief in takings suits. As the Supreme Court has repeatedly held, equitable relief is "generally unavailable" for takings claims because "[a]s long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking." *See Knick v. Township of Scott, Pa*., 139 S. Ct. 2162, 2176 (2019); *E. Enters. v. Apfel*, 524 U.S. 498, 521 (1998) ("[T]he Declaratory Judgment Act allows individuals threatened with a taking to seek declaration of the constitutionality of the disputed government action before *potentially uncompensable* damages are sustained.") (internal citation and quotation marks omitted) (emphasis added). Indeed, except where government action "fails to meet the 'public use' requirement" or "is so arbitrary as to violate due process," the Takings Clause does not actually prohibit government interference with private property. *See Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 543 (2005). The Takings Clause is "designed not to limit the governmental interference with property rights *per se*, but to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id*. at 537 (internal citation and quotation marks omitted).

In the light of these principles, it is clear that monetary relief is the sole remedy that plaintiffs could in fact seek for the alleged taking. First, plaintiffs lack a basis for injunctive or declaratory relief because they do not allege that PROMESA fails to meet the public use requirement or is so arbitrary as to violate due process. *See* Compl. ¶ 35 (acknowledging that

---

Except with respect to any orders entered to remedy constitutional violations, no order of any court granting declaratory or injunctive relief against the Oversight Board, including relief permitting or requiring the obligation, borrowing, or expenditure of funds, shall take effect during the pendency of the action before such court . . . . §2126(c).

PROMESA was enacted for the "public purpose of ameliorating Puerto Rico's financial crisis"). Moreover, the case that defendant cites as an example of the Title III court's refusal to confirm a plan for violation of the Fifth Amendment is inapposite: there, "no one dispute[d] that [Puerto Rico] engaged in prepetition takings of some property." *In re Fin. Oversight & Mgmt. Bd.*, 41 F.4th 29, 43 (1st Cir. 2022). The debtor thus had an *existing* obligation to pay just compensation and the question before the Title III court was whether the Fifth Amendment permitted the impairment of that obligation through bankruptcy. *See id.* at 46. Defendant does not cite, and we have not found, a case in which the Title III court refused to confirm a plan because the plan itself would effect an uncompensated taking.

Given the inadequacy of remedies available in district court for plaintiffs' takings claim, we do not find in PROMESA unambiguous congressional intent to displace this court's Tucker Act jurisdiction. Indeed, this case is unlike those cases in which Tucker Act jurisdiction was displaced by a "specific and comprehensive scheme for administrative and judicial review" of the plaintiff's takings claim. *See Alpine PCS, Inc. v. United States*, 878 F.3d, 1086, 1092 (Fed. Cir. 2018). In such cases, two conditions were met: first, the alleged taking resulted from a federal agency's action; second, Congress had created a statutory framework for both administrative and judicial review of that agency's actions. *See Alpine PCS, Inc.*, 878 F.3d at 1097-98 (explaining how the Communications Act provides for administrative and judicial review of challenges to license cancellations, including claims that a cancellation effected a taking); *Horne*, 569 U.S. at 527 (explaining how the Agricultural Marketing Agreement Act provides for administrative and judicial review of objections to marketing orders, including claims that a marketing order effected a taking); *Vereda, Ltda. v. United States*, 271 F.3d 1367, 1375 (Fed. Cir. 2001) (explaining how the Controlled Substance Act provides for administrative and judicial review of challenges to forfeitures of property, including claims that a forfeiture effected a taking). Neither of those conditions, however, are met here. Plaintiffs allege a taking effected by Congress's enactment of PROMESA itself, which is not a claim for which PROMESA provides a scheme of administrative and judicial review.[10]

---

[10] Defendant's reliance on *Hinck v. United States*, 550 US. 501 (2007) is also misplaced because *Hinck* did not involve Tucker Act jurisdiction over takings claims. Instead, *Hinck* addressed whether 28 U.S.C. § 6404(h)(1) vests exclusive jurisdiction in the Tax Court to review § 6404(e)(1) determinations despite statutes granting jurisdiction to the district courts and the Court of Federal Claims to review tax refund actions. *See Hinck*, 550 U.S. at 507. And in answering that question in the affirmative, the Court relied not

Because PROMESA does not reflect Congress's unambiguous intent to displace Tucker Act jurisdiction, we retain jurisdiction over plaintiffs' takings claim.

### C. Exercising Jurisdiction over Plaintiffs' Takings Claim Would Not Require Improper Review of the Title III Court's Decision.

Next, defendant argues that even if PROMESA does not displace the Tucker Act, this court still lacks jurisdiction because "considering the merits of [plaintiffs'] claim would require this Court to review and find error in the decisions of the Title III court in adjudicating COFINA's restructuring." Def.'s Mot. to Dismiss at 18. Specifically, defendant points out that the Title III court already considered and "rejected claims from junior COFINA bondholders that the confirmation plan arising from PROMESA effected a Fifth Amendment taking of the bondholders' liens on the SUT revenues." *Id*. at 19.

As is well established, this court "has no jurisdiction to review the merits of a decision rendered by a federal district court." *Shinnecock Indian Nation v. United States*, 782 F.3d 1345, 1352 (Fed. Cir. 2015); *see also Allustiarte v. United States*, 256 F.3d 1349, 1352 (Fed. Cir. 2001) (holding that the Court of Federal Claims lacks jurisdiction to review the decision of bankruptcy courts). We thus lack jurisdiction to hear claims which amount to a collateral attack on the judgment of the district court, such as a claim in which the plaintiff alleges that the district court effected a taking by improper application of the law. *See Shinnecock Indian Nation*, 782 F.3d at 1353.

But plaintiffs' takings claim is not a collateral attack on the decision of the Title III court. According to plaintiffs, the confirmation of the Plan "simply describes part of the process that resulted in the taking of COFINA Bondholders' property," a process to which plaintiffs attribute no legal error. *See* Pls.' Resp. at 11. Indeed, we have jurisdiction over plaintiffs' takings claim because it does not require us to scrutinize the Title III court's reasoning or result—the merits of plaintiffs' claim do not depend on whether

---

only on the principle that a "precisely drawn, detailed statute pre-empts more general remedies," but also on the principle that "when Congress enacts a specific remedy when no remedy was previously recognized . . . the remedy provided is generally regarded as exclusive." *See id*. at 506. The latter principle does not apply here because PROMESA did not create a previously unrecognized remedy for takings in violation of the Fifth Amendment.

the Title III court properly confirmed the Plan. *See Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1345 (Fed. Cir. 2002) (holding that the Court of Federal Claims had jurisdiction over the plaintiffs' takings claim because the claim was "not based on the propriety of the district court's decision"). Plaintiffs could succeed on the merits even if the Title III court's decision was proper, because the theory of liability behind their takings claim is an attack on Congress's enactment of PROMESA for authorizing the Title III process in the first place.

Moreover, the takings claim that the Title III court rejected is not the same takings claim plaintiffs bring here. That is, the Title III court only considered whether the Plan and Settlement Agreement submitted by the Oversight Board would take COFINA bondholders' property without just compensation. *See In re. Fin. Oversight*, 361 F. Supp. 3d at 244 ("[T]he character of the governmental action strongly supports the Court's conclusion that the Plan and Settlement Agreement do not result in an unconstitutional taking."); *id*. at 245 ("The objections to the Plan and Settlement Agreement based upon the Takings Clause of the United States Constitution are therefore overruled."). The Title III court did *not* address whether the United States could be held liable for a taking based specifically on Congress's enactment of PROMESA.

Because plaintiffs' takings claim is not an improper collateral attack on the decision of the Title III court, we retain jurisdiction over their claim.

### D. This Court Has Jurisdiction over the Claims of Plaintiffs Added in the Amended Complaints.

Defendant's final argument is that we lack jurisdiction over the claims of plaintiffs added in the amended complaints, because the amendments were filed outside of the six-year statute of limitations for this court. *See* 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). In making this argument, defendant asserts—based on the allegations of the complaint—that the underlying takings claim accrued on June 30, 2016, when PROMESA was enacted.[11] It

---

[11] Plaintiffs did not challenge this assumption about claim accrual in their response to defendant's motion, even though they acknowledged at oral argument that their claim would not have been ripe in 2016. Notwithstanding the imprecision in plaintiffs' takings claim, we take their allegations at face value for purposes of ruling on defendant's jurisdictional arguments. Because plaintiffs allege that Congress's enactment of PROMESA took their

apparently concedes that the originally named plaintiffs filed timely claims, whereas the amended complaints untimely added the claims of eight other plaintiffs.

Defendant argues that we lack jurisdiction over the claims of untimely added plaintiffs because § 2501 may not be equitably tolled by the filing of a class action complaint. We need not address the availability of equitable tolling, however, because tolling is not the only way to add plaintiffs who might otherwise be barred by § 2501. RCFC 15(c)(1)(B) provides another avenue: the rule allows complaints to be amended outside the statute of limitations so long as the amendment "relates back" to the original pleading. *See Big Oak Farms, Inc. v. United States*, 141 Fed. Cl. 482, 489 (2019) (identifying RCFC 15(c)(1)(B) and class action tolling as two different avenues for adding plaintiffs outside the statute of limitations); *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1370 (Fed. Cir. 2004) (holding that RCFC 15(c) "overcome[s]" jurisdictional challenges based on § 2501). To determine whether the addition of plaintiffs sufficiently "relates back" under RCFC 15(c)(1)(B), this court weighs whether: "(1) the claim arose out of the 'same conduct, transaction, or occurrence' as the original complaint; (2) the new plaintiff shares an 'identity of interest' with the original complaint; (3) the defendant had 'fair notice' of the new plaintiff's claim; and (4) the addition of the new plaintiff causes the defendant prejudice." *See Big Oak Farms*, 141 Fed. Cl. at 489.

All four of these factors weigh in favor of finding that the addition of plaintiffs "relates back" to the original complaint. The additional plaintiffs allege, just like the original plaintiffs, that they are owners of a substantial quantity of First Subordinated Secured COFINA bonds and that their property interests as bondholders were taken without just compensation as the direct and intended result of Congress's enactment of COFINA. *See* Compl. ¶ 1-8. Moreover, whether the additional plaintiffs can establish a claim does not depend on factual circumstances unique to each plaintiff; whatever effect the enactment of PROMESA may have had on the value of COFINA bonds and the junior COFINA bondholders' rate of recovery, the impact would have been the same. *See Big Oak Farms*, 141 Fed. Cl. at 490-91 (finding no "identity of interest" or "fair notice" to the defendant because "the duration and severity of the flooding must be assessed on a case by case basis along with the character of the land at issue" for each plaintiff to establish a takings claim). Nor does the addition of eight plaintiffs cause

---

property without just compensation, we construe June 30, 2016 to be the date of taking, which makes claims filed after July 1, 2022 untimely in the absence of tolling or RCFC 15(c)(1)(B).

undue prejudice to defendant by significantly expanding discovery or unreasonably broadening the issues. *See id*. at 491 ("Increasing the number of plaintiffs by over 100 creates a clear litigation burden particularly given the years that have passed and the proof required to prove impacts to property more than seven years after the flooding in 2011.").

Because RCFC 15(c)(1)(B) allows the amendments that were made, we find that we have jurisdiction over the claims of all plaintiffs currently named in the second amended complaint. Having found no impediment to our jurisdiction over this action, we next address whether plaintiffs state a claim upon which relief could be granted.

## II.   Plaintiffs Fail to State a Claim Under RCFC 12(b)(6).

The court may grant a motion to dismiss for failure to state a claim when "a complaint does not allege facts that show the plaintiff is entitled to the legal remedy sought." *Steffen v. United States*, 995 F.3d 1377, 1379 (Fed. Cir. 2021). Although the court is required to accept as true all factual allegations pleaded when ruling on a RCFC 12(b)(6) motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face" to survive dismissal. *Frankel v. United States*, 842 F.3d 1246, 1249 (Fed. Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are not sufficient. *Twombly*, 550 U.S. at 555.

Defendant makes five arguments in support of its motion to dismiss under RCFC 12(b)(6): (1) plaintiffs do not plausibly allege cognizable property interests; (2) even if plaintiffs allege cognizable property interests, collateral estoppel bars the claim that such interests were taken; (3) there is no government action sufficient to establish a taking because Congress did not command or coerce the Oversight Board to restructure COFINA's debts; (4) plaintiffs allege a mere frustration of contract rights by the government, which is insufficient to constitute a taking; (5) plaintiffs fail to state a cognizable regulatory takings claim under *Penn Central*. As explained below, we reject the first two arguments but agree with defendant's third argument that Congress's enactment of PROMESA is not a sufficient basis to support a takings claim. Having concluded that plaintiffs fail to state a claim upon which relief could be granted, we do not find it necessary to decide defendant's remaining two arguments.

### A.  Plaintiffs' Allegations Regarding Their Property Interests Do Not Warrant Dismissal.

When adjudicating a takings claim, the court must first determine whether the plaintiff has established a property interest cognizable under the Fifth Amendment. *Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377 (Fed. Cir. 2008). It is only after identifying a valid property interest that the court must determine "whether the government action at issue amounted to a compensable taking of that property interest." *Id.* at 1378 (quoting *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004)).

The Fifth Amendment protects tangible property, such as real and personal property, as well as intangible property, such as contractual rights and rights to enforce a lien. *Id.* at 1377-78 (holding that the contract rights the plaintiff alleged were valid property interests under the Fifth Amendment); *Armstrong v. United States*, 364 U.S. 40, 44 (1960) (holding that the petitioners' rights to enforce their asserted liens were compensable property interests under the Fifth Amendment). Because the Fifth Amendment does not itself create a property interest, however, "the existence of a property interest is determined by reference to existing rules or understandings stemming from an independent source such as state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). When the asserted property interest arose is also critical, because "only persons with a valid property interest *at the time of the taking* are entitled to compensation." *Reoforce, Inc. v. United States,* 853 F.3d 1249, 1263 (Fed. Cir.2017) (quoting *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001)); *see also A&D Auto Sales, Inc. v. United States,* 748 F.3d 1142, 1153 (Fed. Cir. 2014) (holding that plaintiffs had valid and compensable property interests because "[t]he challenged government action did not predate the acquisition of the plaintiffs' interests").

Plaintiffs allege in their complaint that they were "at all material times the owners of a substantial quantity of COFINA bonds," from which two types of cognizable property interests arise: first, a contractual right to repayment of principal and interest on the bonds, and second, a lien on the DSTF and all COFINA revenues that could be enforced in the event of a default on that repayment.[12] *See* Compl. ¶ 1-7. And as they clarify in their

---

[12] A valid security interest would be limited to a lien on SUT revenues already collected at the time of the alleged taking, because Puerto Rico law

response to defendant's motion, the reference to "material times" means the date range from June 30, 2016, to February 5, 2019. *See* Pls.' Resp. at 17. Defendant argues, however, that plaintiffs fail to plausibly allege cognizable property interests because their complaint contains no more than a "boilerplate allegation" later supplemented with attorney argument. *See* Def.'s Reply at 12.

Although we agree that the complaint lacks specific factual allegations regarding each plaintiff's ownership of COFINA bonds, a right to repayment on the bonds as well as a lien on revenues are valid property interests, and there is no reason to believe that plaintiffs could not supply particularized allegations about when they acquired the bonds. *See Steffen*, 995 F.3d at 1380 (finding that granting leave to amend the complaint would be futile because the plaintiffs could not establish one of the statutory requirements as a matter of law). As such, dismissal under RCFC 12(b)(6) is not the appropriate remedy for plaintiffs' failure to include specific allegations establishing their bond ownership. *See A&D Auto Sales*, 748 F.3d at 1158-59 ("The plaintiffs have failed to properly allege economic loss, but at oral argument in this court they . . . made clear that they intended to establish loss of value. In this situation the appropriate remedy is to grant leave to amend to include specific allegations establishing loss of value."). Indeed, defendant's argument is belied by its next assertion, in which it contends that the Title III court already resolved the claim that plaintiffs' property interests (presumably not illusory) were taken.

### B. Collateral Estoppel Does Not Bar Plaintiffs' Claim.

Collateral estoppel, or issue preclusion, "bar[s] the revisiting of issues that have already been litigated by the same parties or their privies based on the same cause of action." *Banner v. United States*, 238 F.3d 1348, 1354 (Fed. Cir. 2001). The four requirements of collateral estoppel are: "(1) the issues are identical to those in a prior proceeding, (2) the issues were actually litigated, (3) the determination of the issues was necessary to the resulting judgment, and (4) the party defending against preclusion had a full and fair opportunity to litigate the issues." *Id*. As discussed above, however, the takings claim that the Title III court addressed is not the same claim that plaintiffs present here: the Title III court did not decide whether the United States was liable for a taking based on Congress's enactment of PROMESA.

---

does not recognize the mere expectancy of property as a property interest. *See In re Fin. Oversight*, 948 F.3d at 468 n.8 ("Puerto Rico law recognizes that the mere expectancy of property is not itself a property interest."); *id*. at 472 ("It is impossible to have a lien on something that does not exist.").

Accordingly, the issues here are not identical to those in a prior proceeding, and collateral estoppel does not bar plaintiffs' claim.

### C. Nevertheless, Regardless of Which Regulatory Takings Test Is Applied, Congress's Enactment of PROMESA Does Not Amount to a Taking as a Matter of Law.

Earlier, we rejected defendant's argument that we lack jurisdiction because plaintiffs' takings claim is necessarily predicated on the actions of the Oversight Board, a territorial entity. We took plaintiffs' allegations in the complaint at face value for purposes of our jurisdictional inquiry and held that whether there was sufficient federal action to warrant liability in the United States went to the merits of plaintiffs' claim, not to our jurisdiction. We now address that question on the merits.

Although it is clear that plaintiffs assert a regulatory taking, the parties disagree about which type of test applies. Plaintiffs argue for application of a *per se* regulatory takings test; defendant argues that the more nuanced *Penn Central* test applies. The dispute turns out to be immaterial, however. Irrespective of which test is applied, there is a fatal flaw in plaintiffs' logic. The United States has to have been responsible for the taking, yet, as we alluded to earlier, plaintiffs cannot complete their claim here without relying on what turn out to be the actions of independent actors. Indeed, it became clear at oral argument that plaintiffs recognize that nothing was taken from them by the mere passage of PROMESA—their property interests were impaired only after the Oversight Board, a non-federal entity, took a series of actions. Barring unusual circumstances not present here, however, a taking involving third parties is insufficient to amount to a compensable regulatory taking. *See A&D Auto Sales,* 748 F.3d at 1153.

The Federal Circuit held in *A&D Auto Sales* that although "[t]here is no per se rule either precluding or imposing liability when the government instigates action by a third party," there are "two broad principles" to guide the analysis. *Id*. First, "government action directed to a third party does not give rise to a taking if its effects on the plaintiff are merely unintended or collateral." *Id*. Second, even if the effects on the plaintiff are direct and intended, takings liability is limited to circumstances in which "the third party is acting as the government's agent or the government's influence over the third party was coercive rather than merely persuasive." *See id*. at 1154.

Thus, to be entitled to just compensation, plaintiffs would need to show that: (1) Congress enacted PROMESA with the intent to restructure COFINA's debts and take plaintiffs' property interests as COFINA

bondholders; and (2) either the Oversight Board acted as an agent of the United States in filing a Title III petition for COFINA or the United States coerced the Oversight Board to do so. Yet, even if we assumed that Congress intended the restructuring of COFINA's debts—despite the fact that PROMESA does not once mention COFINA—plaintiffs could not get past the second hurdle. They in fact make no attempt to do so, alleging neither an agency relationship nor coercion. *See* Oral Arg. at 48:44 to 49:04 ("There wasn't coercion. We're not arguing that. What we are saying is there was only one reason why Congress passed PROMESA. And that was to get at the funds held by COFINA and a handful of other entities that had also issued bonds.").

Indeed, it is clear that plaintiffs could not establish either an agency relationship or coercion in this case as a matter of law. Whereas "[a]n agency relationship may exist where the third party is hired or granted legal authority to carry out the government's business," *A&D Auto Sales,* 748 F.3d at 1154, the Supreme Court has held that the Oversight Board is a territorial entity that "acts not on behalf of the United States, but on behalf of, and in the interests of, Puerto Rico" in a Title III proceeding. *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649, 1662 (2020). As such, the Oversight Board could not have acted as an agent of the United States in the Title III case for COFINA. *See Altair II,* 151 Fed. Cl. at 287 ("The acts of the [Oversight] Board are not attributable, directly or indirectly, to the United States in a manner needed to sustain liability under the fifth amendment for an alleged taking."). Similarly, no reading of the language of PROMESA could support a finding that the United States required the Oversight Board to initiate Title III proceedings on behalf of COFINA. To the contrary, PROMESA expressly provided for the Oversight Board to act in its "sole discretion" at each of the step that was necessary for the restructuring of COFINA's debts.

Although plaintiffs cite a number of cases where mere "authorization" by the federal government was sufficient to constitute a taking, those cases are not apposite. *See, e.g., Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021); *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996); *Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991). Whereas each of those cases involved authorization of physical takings, plaintiffs here do not and could not allege a physical appropriation of property. Such factual predicates, however, matter. Under the Supreme Court's takings jurisprudence, the difference between physical and non-physical takings is significant enough that it is "inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a 'regulatory taking,' and vice versa." *See Tahoe-Sierra Pres. Council, Inc. v.*

*Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323 (2002). Plaintiffs do not cite, and we have not found, any case in which mere authorization was sufficient to constitute a compensable taking when property was not physically appropriated.

Because the mere enactment of PROMESA had no impact on plaintiffs' property interests, plaintiffs cannot receive just compensation without showing that the Oversight Board acted either as an agent of the United States or under coercion of the United States. Plaintiffs, however, cannot show either. Accordingly, Congress's enactment of PROMESA is not sufficient federal government action to constitute a taking. We therefore dismiss plaintiffs' claim for failure to state a claim upon which relief can be granted.

<u>CONCLUSION</u>

For the foregoing reasons, defendant's motion for dismissal under RCFC 12(b)(6) is GRANTED.  The Clerk is directed to enter judgment accordingly.  No costs.

<u>s/Eric G. Bruggink</u>
ERIC G. BRUGGINK
Senior Judge